1   Robert C. Moest, Of Counsel, SBN 62166
2   **THE BROWN LAW FIRM, P.C.**
    2530 Wilshire Boulevard, Second Floor
3   Santa Monica, California 90403
    Telephone: (310) 915-6628
4   Facsimile: (310) 915-9897
    Email: RMoest@aol.com

5   *Counsel for Plaintiff*

6   [Additional Counsel on Signature Page]

7              **UNITED STATES DISTRICT COURT**
8              **NORTHERN DISTRICT OF CALIFORNIA**

9

10  DALTON DOUGLAS, derivatively on
    behalf of DOXIMITY, INC.,                Case No.:
11
                   Plaintiff,
12
                                             DEMAND FOR JURY TRIAL
13         v.

14  JEFFREY TANGNEY, ANNA                    **VERIFIED SHAREHOLDER**
15  BRYSON, REGINA BENJAMIN, M.D.,           **DERIVATIVE COMPLAINT**
    TIMOTHY CABRAL, KEVIN SPAIN,
16  KIRA WAMPLER, and PHOEBE
    YANG,
17
18                 Defendants,

19
           and
20
    DOXIMITY, INC.,
21
22                 Nominal Defendant.

23

24

25

26

27

28

## INTRODUCTION

Plaintiff Dalton Douglas ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Doximity, Inc. ("Doximity" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jeffrey Tangney ("Tangney"), Anna Bryson ("Bryson"), Regina Benjamin, M.D. ("Benjamin"), Timothy Cabral ("Cabral"), Kevin Spain ("Spain"), Kira Wampler ("Wampler"), and Phoebe Yang ("Yang"), (collectively, the "Individual Defendants," and together with Doximity, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Doximity, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Tangney and Bryson under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Doximity, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the controlling shareholders, directors, and officers of Doximity from February 9, 2022 through April 1, 2024, both dates inclusive (the "Relevant Period").

2.      Doximity is a Delaware corporation located in California that operates an online digital platform intended for U.S. medical professionals to make connections and facilitate communication among each other. Since 2010, Doximity has provided connections between, medical information to, and patient scheduling tools for the Company's now over two million registered members. For this reason, Doximity was coined "LinkedIn for doctors."

3.      Doximity has grown rapidly since its 2010 founding. In 2013, the Company's membership included just 10% of all U.S. physicians. Today, the Company reaches more than 80% of U.S. physicians and more than 50% of U.S. nurse practitioners and physician assistants.

4.      Doximity's business model permits members to use the platform for free but charges entities such as pharmaceutical companies and health systems ("Customers") a subscription fee in exchange for Customers to promote their services and products to Doximity's members on Doximity's platform. Therefore, as the Company's membership base grows, the platform becomes more valuable to Customers since Customers' marketing will reach more medical professionals. Indeed, as the Company's membership swelled through the COVID-19 pandemic, Doximity's revenue growth skyrocketed from $86 million for the 2019 Fiscal Year[1] to $419 million for the 2023 Fiscal Year.

5.      The Company's business is split into three segments: Marketing Solutions, Hiring Solutions, and Telehealth Solutions. Doximity's main revenue source comes from the Marketing Solutions and Hiring Solutions segments. Marketing Solutions enables pharmaceutical manufacturers, hospitals, and health systems to advertise their products and

---

[1] Doximity's fiscal year does not mirror the calendar year but rather begins on April 1st and concludes on March 31st of each year.
For the period between April 1st, 2018 to March 31st, 2019 (the "2019 Fiscal Year")
For the period between April 1st, 2021, to March 31st, 2022 (the "2022 Fiscal Year")
For the period between April 1st, 2022, to March 31st, 2023 (the "2023 Fiscal Year")
For the period between April 1st, 2023, to March 31st, 2024 (the "2024 Fiscal Year")

Verified Shareholder Derivative Complaint

services to Doximity users. Customer marketing materials often include what the Customer's medication does, who the medication is intended for, what the medication treats, demographic information for patients who use the medication, and how a patient could pay for the medication.

6.     Doximity's Hiring Solutions segment provides Customers such as health systems and medical recruiting firms with digital recruiting capabilities to enable them to identify, connect with, and hire from Doximity's network of both active and passive potential medical professional candidates.

7.     Customers purchase subscriptions for specific modules that reach a monthly target amount of Doximity members. Subscription rates are based on several factors, including the number of members targeted, the composition of the targeted members, and the specific modules purchased.

8.     Beginning with the Company's release of quarterly financial results for the third quarter of the 2022 Fiscal Year on February 9, 2022, the Individual Defendants began to publicly maintain that the Company's business prospects were sustainable while downplaying the Company's reliance on Customer upsell rates. Indeed, on February 8, 2022 during the Company's quarterly investor earnings call on February 8, 2022, Defendant Bryson, Doximity's Chief Financial Officer ("CFO"), stated to investors that "marketers have been able to witness the value of running these digital programs" and it was because of this "value ***that's the main reason we're seeing sustained demand*** from our customers."[2] Defendant Bryson further emphasized that Doximity's focus was based upon "really building a business that ***can provide years of sustainable growth*** with high margins."

9.     Throughout the Relevant Period, the Individual Defendants continued to make, and/or caused the Company to make, a series of false and misleading statements to investors and the public that made Doximity's business prospects appear sustainable and

---

[2] All emphasis is added unless otherwise noted.

Verified Shareholder Derivative Complaint

that the Company's financial performance was not overly reliant upon Customer upsell rates. On one instance on November 10, 2022, during Doximity's quarterly earnings call for the second quarter of the 2023 Fiscal Year, in response to investor concerns regarding macroeconomic headwinds having an impact on the Company's financial performance, Defendant Tangney, Doximity's Chief Executive Officer ("CEO"), stated that "pharma's doing quite well." Defendant Bryson went on to announce that Doximity's sales pipeline has "bigger dollar deals than we've seen before" and that although the Company's upsell rates were "a little below historical norms," Customer upsells were "***not a significant portion of [Doximity's] revenue***."

10.    Defendant Bryson continued doubling down on these notions throughout the Relevant Period. In February 2023, Defendant Bryson stated that the Company is "less dependent on major upsell than prior years." In May 2023, Defendant Bryson even indicated that Doximity's financial guidance to the market was conservative, as she felt upsell rates were at "half of our historical rate." As a result of the foregoing, Doximity's public statements were materially false and misleading at all relevant times.

11.    The truth began to emerge on August 8, 2023, when Doximity reported its financial results for the first quarter of the 2024 Fiscal Year. While it was revealed that Doximity exceeded its quarterly revenue and EBITDA guidance for the first quarter, Doximity also reported discouraging guidance for the upcoming second quarter while also slashing guidance for the 2024 Fiscal Year. The Company announced that it now expected revenue for the 2024 Fiscal Year to be between $452 million and $468 million, down from the original guidance of $500 million and $506 million, representing a year-over-year growth rate of 7.9% and 11.7%. The Company also revealed an adjusted EBITDA between $193 million and $209 million, down from the original guidance of $216 million and $222 million, representing a year-over-year adjusted EBITDA growth rate between 4.9% and 13.6%.

12.    In explaining this change in expected growth on the quarterly earnings call,

Defendant Tangney stated that, "[d]espite a record upfront this winter, our upsell close rate fell short in June and July" and, "after growing steadily for a decade, *our upsells have now slowed for 2 years in a row*." Further, despite his prior assertions that any effects of "macro headwinds" on the pharmaceutical industry were "overblown," Defendant Tangney admitted that "[p]harma's shift to digital has slowed" and that Doximity now "estimate[s] digital pharma has grown *at half the low-teens growth rate* that we and eMarketer predicted last year." Defendant Tangney further admitted that Customers were not scheduling in-person meetings with sales representatives, resulting in "fewer face-to-face meetings with our clients," a crucial aspect of the Company's upselling model. This resulted in different forms of advertising receiving the "incremental spend" from pharmaceutical advertisers as opposed to Doximity's products. In short, Defendant Tangney claimed that the reduction in Doximity's financial guidance was due to the Company's inability to successfully upsell.

13.     These admissions were further expanded on when Defendant Bryson stated that, "our major upsells have materially underperformed, and *we expect this to continue in the near term*." Although the Company has seen upsell rates half of Doximity's historical rates so far this year, these upsell rates have continued to decline, causing "a sizable impact starting in Q2." This has resulted in the Company's revenue for the remainder of the 2024 Fiscal Year being called into question, with Defendant Bryson admitting that "we continue to have strong visibility into roughly 65% of revenue booked to start the year, but *the remaining 35% has become increasingly difficult to predict*." In response to an analyst question regarding weakness across the Company's product areas, Defendant Bryson responded that "the weakness is in our mid-tier upsells." Responding to another question, Defendant Bryson continued to admit that the weakness in upsells was not just reduced growth, but that "*they declined on an absolute dollar basis*."

14.     As a result of this disappointing guidance, Defendant Tangney stated that Doximity would be forced to cut 10% of its workforce, with the "heaviest [cuts] in our

operations and client service teams where live client visits, printing and manual HML edits are just less needed than in the past." These cuts would reportedly cost the Company "approximately $8 million to $10 million."

15.   On this news, the price of Doximity's stock fell $7.49 per share, or nearly 23%, from a closing price of $32.79 per share on August 8, 2023 to close at $25.30 per share on August 9, 2023.

16.   Approximately eight months later, on April 1, 2024, the truth fully emerged when a report by Jehoshaphat Research (the "Jehoshaphat Report") was published, revealing, among other things, that "Doximity's underlying sales . . . are *declining* at a negative -3-6% rate, but that this decline has been masked through accelerated revenue recognition." (Emphasis in original). According to the Jehoshaphat Report, the Company's revenue growth "has been primarily driven by pulling forward revenues from the future, rather than by underlying business growth," and "Doximity has been recognizing previously-deferred revenues earlier and earlier within any given period" as a way of driving reported revenue growth. Through analyzing the Company's "underlying" revenues, the Jehoshaphat Report further revealed that the Company has not consistently increased "true" revenues since calendar year 2022 and has instead experienced "year-on-year ***declines in revenue*** in the last two consecutive quarters," creating ample resistance to the Company's ability to generate and maintain sustainable revenue growth.

17.   On this news, the price of Doximity's stock fell $1.11 per share, over 4% across two trading-days, from a closing price of $26.91 per share on March 28, 2024, to close at $25.80 per share on April 2, 2024.

18.   During the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) competition and tightening macroeconomic conditions on Doximity had a more substantial impact on the Company's performance than represented; (2) the

Company's reliance on upselling products and services to existing Customers was more vital to Doximity's performance and future growth than was represented; (3) as a result, Doximity's business prospects and the sustainability of revenue growth and profitability were much more fragile than represented; (4) as a further result of the foregoing, the price of Doximity's common stock was artificially inflated; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all times.

19.     Further, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Doximity to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 2022 and July 2023, approximately 3,398,998 shares of Doximity common stock were repurchased, costing the Company over ***$109.1 million***. As the Company's stock was actually worth only $25.80 per share, the price at which it was trading when markets closed on April 2, 2024, the Company overpaid for repurchases of its own stock by ***over $21.4 million in total***.

20.     Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements, reaping personal profits ***exceeding $4.3 million***.

21.     In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, and its CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the

wrongdoing alleged herein— the Company will have to expend many millions of dollars.

22.   The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.   In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.   This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.   This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.   Venue is proper in this District because Doximity's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28.    Plaintiff is a current shareholder of Doximity. Plaintiff has continuously held Doximity common stock since he purchased it on June 29, 2021.

### Nominal Defendant Doximity

29.    Doximity is a Delaware corporation with its headquarters at 500 3rd St., Suite 510, San Francisco, California, 94107. Doximity's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DOCS."

### Defendant Tangney

30.    Defendant Tangney is a co-founder of the Company and has served as the Company's CEO and as a Company director since Doximity's inception in April 2010. Defendant Tangney is also the chairperson of Doximity's Board. According to the proxy statement the Company filed with the SEC on June 14, 2023 (the "2023 Proxy Statement"), as of April 1, 2023, Defendant Tangney beneficially owned 54,333,180 shares of the Company's common stock. His Company stock ownership includes 399,350 shares of Class A common stock and 53,933,830 shares of Class B common stock, representing 60.7 percent of the total voting power of the Company as of that date, thus making Defendant Tangney the controlling shareholder of the Company as of that date. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023 was $32.38, Defendant Tangney owned approximately $12,930,953 worth of Doximity Class A stock as of that date.[3]

31.    For the 2023 Fiscal Year, Defendant Tangney received $243,726 in total compensation from the Company. This included $240,000 in salary, and $3,726 in all other compensation.

---

[3] The 2023 Proxy Statement's record date was April 1, 2023; however, the stock market was not open on April 1, 2023. Therefore, stock ownership amounts for the Individual Defendants are calculated using the closing price of the Company's common stock on the previous trading day before the record date, March 31, 2023.

Verified Shareholder Derivative Complaint

32.    The 2023 Proxy Statement stated the following about Defendant Tangney:

*Jeffrey Tangney* Mr. Tangney is our co-founder and has served as our Chief Executive Officer and as a member of our board of directors since our inception in April 2010. Jeffrey Tangney co-founded Epocrates, Inc., a mobile medical reference app company, in June 1999, and held various management positions at Epocrates through March 2010, most recently as its president and chief operating officer, as well as executive vice president of sales and marketing, since September 2005. From June 1993 to August 1997, Mr. Tangney served as a manager of ZS Associates, a consulting firm. Mr. Tangney holds a B.S. in Economics and Math from the University of Wisconsin-Madison and an M.B.A. from the Stanford Graduate School of Business.

We believe Mr. Tangney is qualified to serve as a member of our board of directors because of the perspective and experience he brings as our Chief Executive Officer.

**Defendant Bryson**

33.    Defendant Bryson has served as the Company's CFO since February 2021. Prior to being appointed as CFO, Defendant Bryson served various roles within the Company, including most recently (prior to becoming CFO) as Vice President of Strategic Finance, Financial Planning, and Analysis. According to the 2023 Proxy Statement, as of April 1, 2023, Defendant Bryson beneficially owned 491,445 shares of the Company's common stock. Her Company stock ownership includes 104,763 shares of Class A common stock and 386,682 shares of Class B common stock. Given that the price per share of the Company's common stock at the close of trading on March 31, 2023, was $32.38, Defendant Bryson owned approximately $3,392,225 worth of Doximity Class A stock as of that date.

34.    For the 2023 Fiscal Year, Defendant Bryson received $453,709 in total compensation from the Company. This included $300,000 in salary, $150,000 in non-equity incentive plan compensation, and $3,709 in all other compensation.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bryson made the following sale of Company Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 2/2/2023 | 25,000 | $40.00 | $1,000,000 |

Thus, in total, before the fraud was exposed, she sold 25,000 shares of Company class A common stock on inside information, for which she received approximately $1 million in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

36.     The 2023 Proxy Statement stated the following about Defendant Bryson:

*Anna Bryson*. Ms. Bryson has served as our Chief Financial Officer since February 2021. From August 2017 to February 2021, Ms. Bryson served in various finance roles within our company, most recently as our VP of Strategic Finance, Financial Planning, and Analysis. Prior to joining our company, Ms. Bryson served as the founder and chief executive officer of ACB Capital, an investment advisory firm, from June 2012 to July 2017. Ms. Bryson holds both a B.A. and an M.A. in Philosophy, Politics, and Economics from the University of Oxford.

**Defendant Benjamin**

37.     Defendant Benjamin has served as a Company director since March 2020 and serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee. According to the 2023 Proxy Statement, as of April 1, 2023, Defendant Benjamin beneficially owned 361,586 shares of the Company's common stock. Her Company stock ownership is solely made up of Class B common stock.

38.     For the 2023 Fiscal Year, Defendant Benjamin received $239,254 in total compensation from the Company. This included $44,000 in fees earned or paid in cash, and $195,254 in stock awards.

39.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Benjamin made the following sale of Company Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| 2/11/2022 | 10,000 | $58.68 | $586,820 |

Thus, in total, before the fraud was exposed, she sold 10,000 shares of Company Class A common stock on inside information, for which she received approximately $586,820 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

40.     The 2023 Proxy Statement stated the following about Defendant Benjamin:

*Regina Benjamin, M.D.* Dr. Benjamin has served as a member of our board since September 2020. Dr. Benjamin is currently the founder and chief executive officer of, and is a practicing physician at, BayouClinic, Inc., since January 1990. Dr. Benjamin was appointed as the 18th United States Surgeon General by President Barack Obama in July 2009 and served in that role from November 2009 to August 2013. In addition, Dr. Benjamin has approximately 30 years of experience as a practicing family physician. Dr. Benjamin has served as the founder and chief executive officer of the BayouClinic/Gulf States Health Policy Center since 1990, and as the NOLA.com/Times Picayune Endowed Chair in Public Health Sciences at Xavier University of Louisiana since September 2013. Dr. Benjamin served as a member of the boards of directors of each of the Oak Street Health, Inc., a public healthcare services company, from October 2020 to May 2023, Ascension Health Alliance, a private healthcare company, since June 2014, Computer Programs and Systems, Inc., a public technology company, since November 2017, and Kaiser Foundation Hospitals and Health Plan since June 2015. Dr. Benjamin also serves on the advisory board of HealthQuest Capital, a private growth capital firm, since May 2020. Dr. Benjamin served on the board of directors of Alere Inc., a public medical device company, from December 2013 to July 2015, as a member of the March of Dimes Board of Trustees from June 2014 to June 2019, Diplomat Pharmacy, Inc., a public company providing specialty pharmacy services, prior to its acquisition by OptimRx, April 2017 to 2015, and as a member of ConvaTec Group plc, a public medical products and technologies company, from August 2017 to May 2022. Dr. Benjamin holds

a B.S. in Chemistry from Xavier University of Louisiana, an M.D. from the University of Alabama at Birmingham, and an M.B.A from Tulane University.

We believe Dr. Benjamin is qualified to serve on our board of directors because of her extensive experience in both business and practice as a medical doctor and her experience advising other public companies.

**Defendant Cabral**

41.    Defendant Cabral has served as a Company director since September 2020 and serves the chair of the Audit Committee. According to the 2023 Proxy Statement, as of April 1, 2023, Defendant Cabral beneficially owned 458,948 shares of the Company's common stock. His Company stock ownership is solely made up of Class B common stock.

42.    For the 2023 Fiscal Year, Defendant Cabral received $245,254 in total compensation from the Company. This included $50,000 in fees earned or paid in cash, and $195,254 in stock awards.

43.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Cabral made the following sales of Company Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2/14/2023 | 10,000 | $32.55 | $325,460 |
| 2/15/2023 | 7,500 | $35.00 | $262,500 |
| 4/3/2023 | 10,000 | $32.00 | $319,960 |
| 4/11/2023 | 7,500 | $35.00 | $262,500 |
| 7/3/2023 | 10,000 | $33.80 | $338,050 |
| 7/12/2023 | 7,500 | $35.00 | $262,500 |
| 7/28/2023 | 4,714 | $34.96 | $164,787 |

Thus, in total, before the fraud was exposed, he sold 57,214 shares of Company Class A common stock on inside information, for which he received approximately $1,935,757 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

44.    The 2023 Proxy Statement stated the following about Defendant Cabral:

*Timothy Cabral.* Mr. Cabral has served as a member of our board of directors since September 2020. From February 2010 to September 2020, Mr. Cabral served as chief financial officer for Veeva Systems Inc., or Veeva, a public cloud-computing company, during which time the company launched its initial public offering. From February 2008 to February 2010, Mr. Cabral served as chief financial officer and chief operations officer for Modus Group, LLC, a private a wireless solutions and services company, and served as chief financial officer and vice president of operations for Agistics, Inc., a private employee management services company, from March 2005 to June 2007. Prior to its acquisition by Oracle Corporation, Mr. Cabral spent more than seven years at PeopleSoft, Inc., a computer technology company, beginning in November 1997, where he held various positions, including vice president of products & technology finance from June 1999 to January 2005 and senior director of corporate financial planning and analysis from November 1997 to June 1999. Mr. Cabral has served on the board of directors of ServiceTitan, Inc. a private cloud-based home services company, since December 2019, on the board of directors of Veeva since January 2022, and on the board of Singlestore, Inc. a cloud database company, since March 2021. Mr. Cabral previously served on the board of directors of Apttus Corporation, a private software provider, from October 2017 to October 2018, when it was acquired by Thoma Bravo. Mr. Cabral holds a B.S. in Finance from Santa Clara University and an M.B.A. from the Leavey School of Business at Santa Clara University.

We believe Mr. Cabral is qualified to serve on our board of directors because of his previous experience in a lead role of a company during its initial public offering and management thereafter.

**Defendant Spain**

45.    Defendant Spain has served as a Company director since March 2011. He also serves as the chair of the Compensation Committee and as a member of the Audit Committee. According to the 2023 Proxy Statement, as of April 1, 2023, Defendant Spain beneficially owned 19,656,629 shares of the Company's common stock. His Company stock ownership includes 855,901 shares of Class A common stock and 18,800,728 shares of Class B common stock, representing 22.1 percent of the total voting power of the Company as of that date. Given that the price per share of the Company's common stock

at the close of trading on March 31, 2023, was $32.38, Defendant Spain owned approximately $27,714,074 worth of Doximity Class A stock as of that date.

46.     For the 2023 Fiscal Year, Defendant Spain received $247,254 in total compensation from the Company. This included $52,000 in fees earned or paid in cash, and $195,254 in stock awards.

47.     The 2023 Proxy Statement stated the following about Defendant Spain:

*Kevin Spain.* Mr. Spain has served as a member of our board of directors since March 2011. Since March 2011, Mr. Spain has served as general partner of Emergence Capital Partners, a venture capital firm, and served as a principal of Emergence Capital Partners from September 2006 to March 2011. Prior to joining Emergence Capital Partners, Mr. Spain was a member of the corporate development group of Microsoft Corporation, a computer software company, from June 2003 to May 2006, and a member of the corporate development group of Electronic Arts Inc., a game software content and services company, from September 2000 to May 2003. Mr. Spain was previously co-founder and chief executive officer of Madison.com, Inc., which provided a hosted marketing management solution for small and medium sized companies. Mr. Spain served on the board of directors of Veeva Systems Inc., a public cloud-computing company, from May 2008 to July 2014. Mr. Spain currently serves on the board of directors of several privately held companies. Mr. Spain holds a B.A. in Business Administration from the University of Texas at Austin and an M.B.A. from The Wharton School of the University of Pennsylvania.

We believe Mr. Spain is qualified to serve on our board of directors because of his extensive industry experience and his experience advising other public companies.

**Defendant Wampler**

48.     Defendant Wampler has served as a Company director since March 2020. She also serves as the chair of the Nominating and Governance Committee and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of April 1, 2023, Defendant Wampler beneficially owned 527,200 shares of the Company's common stock. Her Company stock ownership is solely made up of Class B common stock.

49.    For the 2023 Fiscal Year, Defendant Wampler received $239,254 in total compensation from the Company. This included $44,000 in fees earned or paid in cash and $192,254 in stock awards.

50.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wampler made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 2/11/2022 | 2,200 | $58.69 | $129,107 |
| 3/1/2022 | 2,200 | $60.73 | $133,614 |
| 4/1/2022 | 2,200 | $53.34 | $117,343 |
| 5/2/2022 | 2,200 | $40.09 | $88,206 |
| 12/14/2023 | 2,500 | $26.00 | $65,000 |
| 12/15/2023 | 2,500 | $26.65 | $66,625 |
| 2/1/2024 | 2,500 | $27.05 | $67,625 |
| 3/1/2024 | 2,500 | $27.88 | $69,700 |
| 4/1/2024 | 2,500 | $26.97 | $67,425 |

Thus, in total, before the fraud was exposed, she sold 18,800 shares of Company stock on inside information, for which he received approximately $737,220 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the scheme.

51.    The 2023 Proxy Statement stated the following about Defendant Wampler:

*Kira Wampler.* Ms. Wampler has served as a member of our board of directors since March 2020. Ms. Wampler has served as venture chair of Redesign Health Inc., a private investment firm and healthcare innovation platform, since February 2020. From November 2016 to March 2019, Ms. Wampler served as the chief executive officer of Art.com Inc., a private art retailer company, during which time she led the company through its acquisition by Walmart Inc. From December 2014 to November 2016, Ms. Wampler served as the chief marketing officer of Lyft, Inc., a mobile ride-sharing app. Ms. Wampler also previously served as chief marketing officer of Trulia, Inc., a private real estate listing company, from November 2013 to November 2014. Ms. Wampler has served on the boards of directors of private companies

including Candid Care Co. from September 2019 to January 2023, Personal Capital Corporation from March 2019 to August 2020, and Healthline Media, Inc. from March 2019 to August 2019. Ms. Wampler holds a B.S. in Foreign Services from Georgetown University School of Foreign Services, where she majored in History and Diplomacy, and an M.B.A. from the Fuqua School of Business at Duke University., City University of New York. We believe Mr. Chizen is qualified to serve as a member of our Board based on his extensive executive leadership experience in digital media and software.

We believe Ms. Wampler is qualified to serve on our board of directors because of her extensive experience advising technology companies as both a director and executive.

**Defendant Yang**

52.    Defendant Yang has served as a Company director since August 2022. She also serves as a member of the Compensation Committee and the Nominating and Governance Committee. According to the 2023 Proxy Statement, as of April 1, 2023, Defendant Yang does not beneficially any shares of the Company's common stock.

53.    For the 2023 Fiscal Year, Defendant Yang received $399,874 in total compensation from the Company. This included $20,000 in fees earned or paid in cash, and $379,874 in stock awards.

54.    The 2023 Proxy Statement stated the following about Defendant Yang:

*Phoebe Yang.* Ms. Yang has served as a member of our board of directors since August 2022. Ms. Yang currently serves on the board of directors of each of GE Healthcare, a leading global S&P 500 medical technology and solutions company, since January 2023, and CommonSpirit Health, one of the largest U.S. tax-exempt health systems, since July 2020. From May 2020 to September 2022, Ms. Yang served as General Manager, Amazon Web Services, Healthcare, where she led Amazon's cloud business focused on enabling healthcare enterprises with advanced cloud technologies. From 2013 to 2018, Ms. Yang served as Chief Strategy Officer and Chief Architect for Population Health at Ascension Health, one of the largest U.S. tax-exempt health systems. Ms. Yang holds a B.A. from the University of Virginia, and a J.D. from Stanford Law School, where she was President of the Stanford Law Review.

We believe Ms. Yang is qualified to serve on our board of directors because of her extensive industry experience as both a director and executive.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

55.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of Doximity and because of their ability to control the business and corporate affairs of Doximity, the Individual Defendants owed Doximity and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Doximity in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Doximity and its shareholders so as to benefit all shareholders equally.

56.     Each controlling shareholder, director and officer of the Company owes to Doximity and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Doximity, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58.     To discharge their duties, the controlling shareholders, officers, and directors of Doximity were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59.     Each Individual Defendant, by virtue of their position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Doximity, the absence of good faith on their part, or a reckless

disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

60.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants, including Defendant Tangney as a controlling shareholder, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

61.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Doximity were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Doximity's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid

wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Doximity conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Doximity and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Doximity's operations would comply with all applicable laws and Doximity's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

62.     Each of the Individual Defendants further owed to Doximity and the shareholders the duty of loyalty requiring that each favor Doximity's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain

personal advantage.

63.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Doximity and were at all times acting within the course and scope of such agency.

64.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Doximity, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

65.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Doximity.

## DOXIMITY'S CODE OF CONDUCT

### *Doximity's Code of Conduct and Ethics*

66.     Doximity's Code of Conduct and Ethics (the "Code of Conduct") guides all directors, officers, and employees of Doximity and its subsidiaries. The "Purpose and Scope" to the Code of Conduct states the following:

> The Company expects its directors, officers and employees to exercise reasonable judgment when conducting the Company's business. The Company encourages its directors, officers and employees to refer to this Code frequently to ensure that they are acting within both the letter and spirit of this Code. The Company also understands that this Code will not answer every problem you may encounter or address every concern you may have about conducting the Company's business ethically and legally.

67.     The "Purpose and Scope" section further goes on to explain that "this Code should be viewed as imposing the *minimum standards* the Company expects from its directors, officers and employees in the conduct of the Company's business." (emphasis in original).

68.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in relevant part: "The Company requires that all employees, officers and

directors comply with all laws, rules and regulations applicable to the Company wherever it does business."

69.    In a section titled "Honest and Ethical Conduct," the Code of Conduct states, in relevant part: "The Company's policy is to promote high standards of integrity by conducting its affairs honestly and ethically."

70.    In a section titled "Accuracy of Records," the Code of Conduct states, in relevant part:

> All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies. . . . No false or misleading entries shall be made in the Company's books or records for any reason."

71.    In a section titled "Quality of Public Disclosures," the Code of Conduct states: "It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications."

72.    In a section titled "Insider Trading," the Code of Conduct states, in relevant part:

> Employees, officers and directors who have material non-public information about the Company or other companies, including our suppliers and customers, as a result of their relationship with the Company are prohibited by law and Company policy from trading in securities of the Company or such other companies, as well as communicating such information to others who might trade on the basis of that information. To help ensure that you do not engage in such prohibited insider trading and avoid even the appearance of an improper transaction, the Company has adopted an Insider Trading Policy, which is distributed to employees and is also available from the Legal Department and posted in our internal Wiki for employees.

### Doximity's Insider Trading Policy

73.    Doximity has standalone Insider Trading Policy that begins by stating that the Insider Trading Policy "is designed to prevent insider trading or the appearance of

impropriety, to satisfy the Company's obligation to reasonably supervise the activities of Company personnel, and to help Company personnel avoid the severe consequences associated with violation of insider trading laws."

74.     In a section titled "To Whom Does This Insider Trading Policy Apply," the Insider Trading Policy is stated to apply to, in relevant part: "the Company's directors, officers, employees and consultants and applies to any and all transactions by such persons . . . in the Company's securities."

75.     In a section titled "What is Prohibited by this Insider Trading Policy," the Insider Trading Policy states, in relevant part, that "[i]t is generally illegal for you to trade in the securities of the Company, whether for your account or for the account of another, while in the possession of material, nonpublic information about the company."

76.     In a section titled "What is Material, Nonpublic Information," the Insider Trading Policy defines "Material" information as "any type of information that could reasonably be expected to affect the market price of the Company's securities." In the same section, the Insider Trading Policy defines "Nonpublic" information as information that "has not been disseminated in a manner making it available to investors generally."

77.     In a section titled "No Trading Except During Trading Windows," the Insider Trading Policy states the trading procedures for the Company. The trading procedures are as follows:

> The announcement of the Company's quarterly financial results ***almost always has the potential to have a material effect on the market for the Company's securities***. Although an Insider may not know the financial results prior to public announcement, if an Insider engages in a trade before the financial results are disclosed to the public, such trades may give an appearance of impropriety that could subject the Insider and the Company to a charge of insider trading. Therefore, subject to limited exceptions described herein, Insiders may trade in Company securities only during four quarterly trading windows and then only after obtaining pre-clearance from the Compliance Officer in accordance with the procedures set forth below. Unless otherwise advised, the four trading windows consist of the periods that begin after market open on the third full trading day following the Company's

issuance of a press release (or other method of broad public dissemination) announcing its quarterly or annual earnings and end at the close of business on the last trading day of the second month of the then-current quarter, so long as the trading window is always at least five trading days in length. Insiders may be allowed to trade outside of a trading window only (a) pursuant to a pre-approved Rule 10b5-1 Plan as described below or (b) in accordance with the procedure for waivers as described below.

By way of example only, if the Company's issuance of a press release announcing its quarterly earnings occurred on Tuesday, February 8, the trading window would open on Friday, February 11 (the third full trading day) and close on Monday, February 28 (the last trading day of the second month of the quarter). See the graphic as an example, wherein the green shaded area would be the open window.

78.     In a section titled "Waivers," the Insider Trading Policy states:

A waiver of any provision of this Insider Trading Policy, or the Trading Procedures contained herein, in a specific instance ma be authorized in writing by the Audit Committee of the Board of Directors, and any such waiver shall be reported to the Company's Board of Directors."

79.     In violation of the Code of Conduct and the Insider Trading Policy, the Individual Defendants (as controlling shareholders, key officers, and as members of the Company's Board) conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, four of the Individual Defendants violated the Code of Conduct and the Insider Trading Policy by engaging in insider trading. Additionally, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

### *Doximity's Audit Committee Charter*

80.     Doximity's Audit Committee Charter opens by stating that the purpose of the

Audit Committee is to:

- assist the Board in its oversight of (1) the integrity of the Company's financial statements, (2) the Company's compliance with legal and regulatory requirements, (3) the qualifications, independence, and performance of the Company's independent auditors, and (4) the performance of the Company's internal audit function; and

- prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

81.    In a section titled "Annual Performance Evaluation of the Audit Committee," the Audit Committee Charter tasks the Audit Committee with "evaluat[ing] its own performance and report[ing] the results of such evaluation to the Board."

82.    In a section titled "Audited Financial Statements and Annual Audit," the Audit Committee Charter tasks the Audit Committee with the following:

- The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditors and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall meet to review, and shall discuss with management (including the Company's Senior Accounting Executive) and with the independent auditors, the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Conditions and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements.

- The Audit Committee must review:

  (i) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including

analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the independent auditors. The Audit Committee may also consider other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

83.     In a section titled "Unaudited Quarterly Financial Statements," the Audit Committee Charter states:

The Audit Committee shall meet to review, and shall discuss with management and the independent auditors, in each case prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.

84.     In a section titled "Earnings Press Releases," the Audit Committee Charter states:

The Audit Committee shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentation to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information).

85.     In a section titled "Legal and Regulatory Compliance," the Audit Committee Charter states:

- The Audit Committee shall discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

- The Audit Committee shall review and approve all related party transactions of the Company in accordance with the policies of the Company in effect from time to time.

86.   In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

87.   Doximity is a Delaware corporation located in California that operates an online digital platform for U.S. medical professionals. Since 2010, Doximity has provided connections between, medical information to, and patient scheduling tools for the Company's now over two million registered members.

88.   Indeed, Doximity has grown rapidly since its founding. In 2013, the Company's membership included just 10% of all U.S. physicians. Today, the Company reaches more than 80% of U.S. physicians and more than 50% of U.S. nurse practitioners and physician assistants.

89.   For this reason, Doximity was coined "LinkedIn for doctors." Doximity's business model permits members to use the platform for free but charges Customers a

subscription fee that allows Customers to promote their services and products to Doximity's members on Doximity's platform. Therefore, by growing the Company's membership base, Doximity has become more valuable to Customers. The Company's revenue growth has skyrocketed from $86 million for the 2019 Fiscal Year to $419 million for the 2023 Fiscal Year.

90. Doximity's main revenue source comes from Customers who utilize Doximity's "Marketing Solutions" and "Hiring Solutions" products. Marketing Solutions advertises Customers' products to Doximity users. Customer marketing materials often include what the Customer's medication does, who it treats, demographic information for patients who use the medication, and how a patient can pay for the medication.

91. Doximity's Hiring Solutions gives Customers access to Doximity's professional tools by allowing Customers to send direct messages to members for talent sourcing and job postings.

92. Customers purchase subscriptions for specific modules that reach a monthly target amount of Doximity members. Subscription rates are based on several factors, including the amount of members targeted, the composition of the targeted members, and the specific modules purchased.

92. During the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) competition and tightening macroeconomic conditions on Doximity had a more substantial impact on the Company's performance than represented; (2) the Company's reliance on upselling products and services to existing Customers was more vital to Doximity's performance and future growth than was represented; (3) as a result, Doximity's business prospects and the sustainability of revenue growth and profitability were much more fragile than represented; (4) as a further result of the foregoing, the price of Doximity's common stock was artificially inflated; and (5) the Company failed to

maintain adequate internal controls. As a result of the foregoing statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all times.

93.     Further, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Doximity to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between June 2022 and July 2023, approximately 3,398,998 shares of Doximity common stock were repurchased, costing the Company over ***$109.1 million***. As the Company's stock was actually worth only $25.80 per share, the price at which it was trading when markets closed on April 2, 2024, the Company overpaid for repurchases of its own stock by ***over $21.4 million in total***.

94.     Moreover, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements, reaping personal profits ***exceeding $4.3 million***.

**<u>False and Misleading Statements</u>**

***February 8, 2022 Press Release***

95.     On February 8, 2022, the Company issued a press release, which it also filed with the SEC on February 9, 2022 via a Form 8-K, announcing Doximity's financial and operating results for the third quarter of the 2022 Fiscal Year (the "3Q 2022 Press Release").

96.     The 3Q 2022 Press Release reported a quarterly revenue of $97.9 million and an adjusted EBITDA of $47 million. These numbers represented year-over-year growth of 67% and 119%, respectively.

***February 8, 2022 Conference Call***

97.     On February 8, 2022, the Company held an earnings call with analysts and investors to discuss Doximity's financial and operating results for the third quarter of the

2022 Fiscal Year ("3Q 2022 Earnings Call"). During the 3Q 2022 Earnings Call, Defendant Bryson told investors that "marketers have been able to witness the value of running these digital programs" and it was this "value that's the main reason we're seeing this sustained demand from our customers and not new [COVID] variants." Defendant Bryson went on to further emphasize that Doximity was "focused on . . . really ***building a business that can provide years of sustainable growth with high margins***."

### May 17, 2022 Press Release and Conference Call

98.    On May 17, 2022, the Company issued a press release announcing its financial and operation results for the fourth quarter and full year of the 2022 Fiscal Year, which was also filed with the SEC via Form 8-K (the "FY 2022 Press Release").

99.    The FY 2022 Press Release reported a quarterly revenue of $93.7 million, and an adjusted EBITDA of $39.4 million. This represented year-over-year growth of 40% and 47%, respectively. Doximity also reported a full year revenue of $343.5 million and an adjusted EBTDA of $150.3 million. This represented a year-over-year growth of 66% and 132%, respectively.

### May 17, 2022 Conference Call

100.    The same day, Doximity held an earnings conference call with investors and analysts to announce the financial and operating results for the fourth quarter and full year for the 2022 Fiscal Year (the "FY 2022 Earnings Call").

101.    On the FY 2022 Earnings Call, Defendant Bryson continued to assert that Doximity "remain[s] focused on building a meaningful business of scale with not only sustainable long-term growth, but also attractive margins." Also during the call, Defendant Bryson stated that the Company's "business exhibits a number of key strengths, which we believe ***position us to drive sustainable growth and profitability*** even in an uncertain market environment."

### June 15, 2022 Proxy Statement

102.    On June 15, 2022, the Company filed with the SEC a proxy statement on

Schedule 14A (the "2022 Proxy Statement"). The 2022 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) reelect Defendants Tangney and Wampler to the Board; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered accounting firm for the 2023 Fiscal Year. The 2022 Proxy Statement was solicited by Defendants Tangney, Benjamin, Cabral, Spain, and Wampler.

103.    Regarding the Board's "Role in Risk Oversight," the 2022 Proxy Statement stated:

> Our board has responsibility for the oversight of our risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from board committees and members of senior management to enable our board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, cybersecurity, strategic, and reputational risk.
>
> Our board believes that open communication between our management team and our board is essential to management and oversight. Our board meets with our Chief Executive Officer and other members of the senior management team at quarterly meetings of our board, as well as at such other times as they deem appropriate, where, among other topics, they discuss major risk exposures, their potential impact on our business and steps we take to manage them.
>
> While our board is ultimately responsible for risk oversight, our board committees assist our board in fulfilling its oversight responsibilities in certain areas of risk. Our audit committee oversees and reviews the Company's guidelines and polices that govern the process by which the Company's exposure to risk is assessed and managed by management. More specifically, our audit committee assists our board in fulfilling its oversight responsibilities with respect to risk assessment and risk management in the areas of internal control over financial reporting, disclosure controls and procedures, legal and regulatory compliance, liquidity risk, enterprise risk management and cybersecurity. Our audit committee also discusses and considers with our management team and Deloitte & Touche LLP the Company's major financial, operational, privacy, security, competition, regulatory, enterprise,

cybersecurity, and accounting risk exposures or other exposures and the steps that the Company's management has taken to monitor and control such exposures. Our nominating and governance committee assists our board in fulfilling its oversight responsibilities with respect to the management of risk associated with our board's organization, membership, structure, corporate governance and environmental, social and governance initiatives. Our compensation committee assesses risks created by the incentives inherent in our compensation policies. Finally, our full board reviews strategic and operational risk in the context of reports from our management team, receives reports on all significant committee activities at each regular meeting and evaluates the risks inherent in significant transactions.

104.    Regarding the Company's Code of Conduct, 2022 Proxy Statement provided, in relevant part:

Our board has adopted a code of conduct that applies to all of our employees, officers and directors, including our chief executive officer, and other executive and senior financial officers. The full text of our code of conduct is available on our investor relations website at https://investors.doximity.com/governance/governancedocuments/default.aspx. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendments to, or waiver from, a provision of our code of conduct by posting such information on the website address and location specified above. During fiscal 2022, no waivers were granted from any provision of the code of conduct.

105.    Defendants Tangney, Benjamin, Cabral, Spain, and Wampler caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Doximity did not have sufficient or effective risk management or compliance controls and procedures; and (2) as a result, Doximity's financial statements and accounting methods for business growth and sustainability failed to accurately report the Company's financial performance, including future prospects.

106.    The 2022 Proxy Statement also failed to disclose, *inter alia*, that: that: (1) competition and tightening macroeconomic conditions on Doximity had a more substantial impact on the Company's performance than represented; (2) the Company's reliance on upselling products and services to existing Customers was more vital to Doximity's performance and future growth than was represented; (3) as a result, Doximity's business

prospects and the sustainability of revenue growth and profitability were much more fragile than represented; (4) as a further result of the foregoing, the price of Doximity's common stock was artificially inflated; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all times.

107. The 2022 Proxy Statement was also false and misleading because it failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; and (2) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed.

108. As a result of Defendants Tangney, Benjamin, Cabral, Spain, and Wampler causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Tangney and Wampler to the Board, allowing them to continue to breach their fiduciary duties to the Company; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered accounting firm for the 2023 Fiscal Year.

### *November 10, 2022 Press Release*

109. On November 10, 2022, the Company issued a press release announcing its financial and operation results for the second quarter of the 2023 Fiscal Year, which was also filed with the SEC via Form 8-K (the "2Q 2023 Press Release").

110. The 2Q 2023 Press Release reported a quarterly revenue of $102.2 million, and an adjusted EBITDA of $46 million. This represented a year-over-year growth of 29% and 40%, respectively. Doximity also reported full year revenue guidance between $424 million and $432 million, which would represent a year-over-year growth between 23.4%

and 25.8%, and an adjusted EBITDA guidance between $178 million and $186 million, which would represent a year-over-year adjusted EBITDA growth between 18.4% and 23.8%.

### November 10, 2022 Conference Call

111.   The same day, Doximity held an earnings conference call with investors and analysts to announce the financial and operating results for the second quarter of the 2023 Fiscal Year (the "2Q 2023 Earnings Call").

112.   On the 2Q 2023 Earnings Call, Defendant Tangney held out to investors that any concerns regarding "pharma digital marketing . . . return[ing] to its pre-pandemic ways" were "overblown."

113.   Regarding Doximity's long-term growth strategy and Doximity's uncommon position of attracting Customers, even in difficult economic situations, Defendant Tangney stated:

> Especially in leaner times, pharma is incredibly measured and disciplined about ROI. Generally, they strive for a 3:1 return on their marketing dollar, and they will continue to invest at that level. Some digital solutions will cut the mustard and some won't, which lead me to perhaps the best out of this call. For third-party studies completed over the last 6 months, our median pharma ROI has improved to over 15:1. That's well above the 10:1 we cited last year in our S-1.
>
> This is for a host of good reasons, including our increased reach and personalization. Our all-time pharma median ROI now stands at 11:1 . . . An 11:1 ROI implies that all else equal, if we theoretically did nothing but raise prices, then *we would have 7 years of 20-plus percent growth ahead of us* before our ROI falls to 3:1. That's the baseline aperture through which we view our long-term growth rate as we've obviously many, many other vectors to grow beyond price.

114.   This outlook was further touted by Defendant Bryson, who told investors that "[w]e are in the early innings of a large and growing market opportunity, aided by a secular shift to digital" and that "we are uniquely advantaged to gain market share as these budgets continue to shift to digital over the next decade." According to Defendant Bryson,

Doximity's revenue was not overly dependent on upselling marketing contracts throughout the year, stating that upselling is "***really not a significant portion of our revenue***" and "the majority of our year in a given fiscal year is coming from these core renewals."

115.    Further, Defendant Bryson spoke optimistically about Doximity's sales pipeline, telling investors "one of the good things about this year is that we've begun to have discussions with our clients earlier than ever, and what that's resulted in for us [is a] pipeline with bigger dollar deals than we've seen before." As such, Defendant Bryson stated that "as far as it comes to our opportunity to cross-sell and upsell in this renewal cycle, ***we feel incredibly optimistic and positive on what we're going to see there***."

### November 10, 2022 Form 10-Q

116.    On November 10, 2022, the Company filed with the SEC its Form 10-Q for the second quarter of the 2023 Fiscal Year (the "2Q 2023 Form 10-Q"). The 2Q 2023 Form 10-Q was signed by Defendants Tangney and Bryson and contained attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Tangney and Bryson attesting to the accuracy of the 2Q 2023 Form 10-Q.

117.    The 2Q 2023 Form 10-Q stated that "[w]hile certain of the COVID-19 pandemic-related trends underlying our positive performance may not continue after the pandemic ceases, we believe that ***certain key underlying trends have been accelerated and will persist long after the pandemic ends***."

### February 9, 2023 Press Release

118.    On February 9, 2023, the Company issued a press release announcing its financial and operation results for the third quarter of the 2023 Fiscal Year, which was also filed with the SEC via Form 8-K (the "3Q 2023 Press Release").

119.    The 3Q 2023 Press Release reported preliminary financial guidance for 2024 Fiscal Year of revenue greater than $500 million, which would represent a year-over-year growth of over 19%, and an adjusted EBITDA margin of at least 43%.

*February 9, 2023 Conference Call*

120.   The same day, Doximity held an earnings conference call with investors and analysts to announce the financial and operating results for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Earnings Call"). Pertaining to expected upsell rates, Defendant Bryson announced that "we are assuming a similar percentage of midyear upsell to what we saw in fiscal 2023, which was about half of our historical upsell rate." Defendant Bryson further added that, if anything, "outperform[ing]" on upsell rates would result in even stronger results because of Doximity's supposed "conservative" financial guidance. Defendant Bryson also told investors that Doximity is "less dependent on major upsell than prior years" and is actually "more dependent on our core annual renewal cycle, which continues to perform really well for us" and that "this year was incredibly strong."

*February 9, 2023 Form 10-Q*

121.   On February 9, 2023, the Company filed with the SEC its Form 10-Q for the third quarter of the 2023 Fiscal Year (the "3Q 2023 Form 10-Q"). The 3Q 2023 Form 10-Q was signed by Defendants Tangney and Bryson and contained attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Tangney and Bryson attesting to the accuracy of the 2Q 2023 Form 10-Q.

122.   The 3Q 2023 Form 10-Q stated that "[w]hile certain of the COVID-19 pandemic-related trends underlying our positive performance may not continue after the pandemic ceases, we believe that ***certain key underlying trends have been accelerated and will persist long after the pandemic ends***."

*May 16, 2023 Press Release*

123.   On May 16, 2023, the Company issued a press release announcing its financial and operation results for the fourth quarter and full year of the 2023 Fiscal Year, which was also filed with the SEC via Form 8-K (the "FY 2023 Press Release").

124.   The FY 2023 Press Release reported a full year revenue of $419.1 million and an adjusted EBTDA of $184 million. This represented a year-over-year growth of 22% and

22%, respectively. The Company also increased its 2024 Fiscal Year revenue guidance to between $500 million and $506 million, which would represent a year-over-year growth between 19.3% and 20.7%, and a 2024 Fiscal Year adjusted EBITDA guidance between $216 million and $222 million, which would represent a year-over-year growth between 17.4% and 20.7%.

### *May 16, 2023 Conference Call*

125.   The same day, Doximity held an earnings conference call with investors and analysts to announce the financial and operating results for the fourth quarter and full year for the 2023 Fiscal Year (the "FY 2023 Earnings Call").

126.   On the FY 2023 Earnings Call, Defendant Bryson stated that "subscription revenue, which comprises 93% of our total revenue, saw growth reaccelerate to 20% in Q4," and told investors, "[w]hile the macro environment remains uncertain, **we are encouraged to see this positive momentum in our core marketing business**." Defendant Bryson further mentioned that, as of the FY 2023 Earnings Call, "we have over 65% of our annual subscription-based revenue guidance under contract" and "**expect another 30% to come from renewals and upsells**, and the remaining 5% from new customers." In response to "continued macro uncertainty," Defendant Bryson stated that the Company was "modeling a similar percentage of midyear upsell to last year which is about half of our historical rate." Defendant Tangney reiterated that "**we're prepared for low upsells**."

### *June 6, 2023, Investor Day*

127.   On June 6, 2023, Doximity hosted its Inaugural Investor Day conference ("2023 Investor Day"). During the 2023 Investor Day, Defendant Bryson told investors that Doximity has "significant potential for future growth within customers that we already work with" through the upsell of additional products and services. Defendant Bryson emphasized that "between the shift to digital, the growing number of mega brands and the new budgets we're unlocking in customers that we already have deep relationships with, we believe we are well positioned to achieve this $1 billion-plus targets in fiscal 2028."

*June 14, 2023 Proxy Statement*

128.   On June 14, 2023, the Company filed the 2023 Proxy Statement. The 2023 Proxy Statement solicited shareholders to vote to, *inter alia*: (1) reelect Defendants Spain and Cabral to the Board; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered accounting firm for the 2024 Fiscal Year; and (3) approve, via non-binding, advisory vote, the frequency of future advisory votes on executive compensation. The 2023 Proxy Statement was solicited by Defendants Tangney, Benjamin, Cabral, Spain, Wampler, and Yang.

129.   Regarding the Board's "Role in Risk Oversight," the 2023 Proxy Statement stated:

> Our board has responsibility for the oversight of our risk management processes and, either as a whole or through its committees, regularly discusses with management our major risk exposures, their potential impact on our business and the steps we take to manage them. The risk oversight process includes receiving regular reports from board committees and members of senior management to enable our board to understand our risk identification, risk management, and risk mitigation strategies with respect to areas of potential material risk, including operations, finance, legal, regulatory, cybersecurity, strategic, and reputational risk.

> Our board believes that open communication between our management team and our board is essential to management and oversight. Our board meets with our Chief Executive Officer and other members of the senior management team at quarterly meetings of our board, as well as at such other times as they deem appropriate, where, among other topics, they discuss major risk exposures, their potential impact on our business and steps we take to manage them.

> While our board is ultimately responsible for risk oversight, our board committees assist our board in fulfilling its oversight responsibilities in certain areas of risk. Our audit committee oversees and reviews the Company's guidelines and polices that govern the process by which the Company's exposure to risk is assessed and managed by management. More specifically, our audit committee assists our board in fulfilling its oversight responsibilities with respect to risk assessment and risk management in the areas of internal control over financial reporting, disclosure controls and procedures, legal and

regulatory compliance, liquidity risk, enterprise risk management and cybersecurity. Our audit committee also discusses and considers with our management team and Deloitte & Touche LLP the Company's major financial, operational, privacy, security, competition, regulatory, enterprise, cybersecurity, and accounting risk exposures or other exposures and the steps that the Company's management has taken to monitor and control such exposures. Our nominating and governance committee assists our board in fulfilling its oversight responsibilities with respect to the management of risk associated with our board's organization, membership, structure, corporate governance and environmental, social and governance initiatives. Our compensation committee assesses risks created by the incentives inherent in our compensation policies. Finally, our full board reviews strategic and operational risk in the context of reports from our management team, receives reports on all significant committee activities at each regular meeting and evaluates the risks inherent in significant transactions.

130.   Regarding the Company's Code of Conduct, the 2023 Proxy Statement provided, in relevant part:

Our board has adopted a code of conduct that applies to all of our employees, officers and directors, including our chief executive officer, and other executive and senior financial officers. The full text of our code of conduct is available on our investor relations website at https://investors.doximity.com/governance/governance-documents/default.aspx. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendments to, or waiver from, a provision of our code of conduct by posting such information on the website address and location specified above. During fiscal 2023, no waivers were granted from any provision of the code of conduct.

131.   Defendants Tangney, Benjamin, Cabral, Spain, Wampler, and Yang caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Doximity did not have sufficient or effective risk management or compliance controls and procedures; and (2) as a result, Doximity's financial statements and accounting methods for business growth and sustainability failed to accurately report the Company's financial performance, including future prospects.

132.   The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) competition and tightening macroeconomic conditions on Doximity had a more substantial

impact on the Company's performance than represented; (2) the Company's reliance on upselling products and services to existing Customers was more vital to Doximity's performance and future growth than was represented; (3) as a result, Doximity's business prospects and the sustainability of revenue growth and profitability were much more fragile than represented; (4) as a further result of the foregoing, the price of Doximity's common stock was artificially inflated; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all times.

133.   The 2023 Proxy Statement was also false and misleading because it failed to disclose that: (1) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements; and (2) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed.

134.   As a result of Defendants Tangney, Benjamin, Cabral, Spain, Wampler, and Yang causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Spain and Cabral to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered accounting firm for the 2024 Fiscal Year; and (3) determine one year as an appropriate frequency of future advisory votes on the compensation of Doximity's named executive officers.

135.   The above statements contained in ¶¶ 95-101 and 109-127 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) competition and tightening macroeconomic conditions on Doximity had a more

substantial impact on the Company's performance than represented; (2) the Company's reliance on upselling products and services to existing Customers was more vital to Doximity's performance and future growth than was represented; (3) as a result, Doximity's business prospects and the sustainability of revenue growth and profitability were much more fragile than represented; (4) as a further result of the foregoing, the price of Doximity's common stock was artificially inflated; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all times.

## THE TRUTH EMERGES

### *August 8, 2023 Press Release*

136.   The truth began to emerge after the market closed on August 8, 2023, when Doximity issued a press release announcing its financial and operation results for the first quarter of the 2024 Fiscal Year, which it also filed via a Form 8-K (the "1Q 2024 Press Release").

137.   The 1Q 2024 Press Release revealed that, while Doximity had exceeded the revenue and adjusted EBITDA guidance set for the first quarter, there was disappointing guidance for the upcoming second quarter. Doximity also reduced its initial guidance for the 2024 Fiscal Year, lowering its expected revenue from between $500 million to $506 million to between $452 million and $468 million, which would represent year-over-year growth of between 7.9% and 11.7%. Similarly, Doximity reduced its adjusted EBITDA guidance from between $216 million and $222 million to between $ $193 million and $209 million, representing year-over-year growth of between 4.9% and 13.6%.

### *August 8, 2023 Conference Call*

138.   The same day, Doximity held an earnings conference call with investors and analysts to announce the financial and operating results for the first quarter for the 2024 Fiscal Year (the "1Q 2024 Earnings Call").

139.   On the 1Q 2024 Earnings Call, Defendant Tangney explained the disappointing guidance as, "[d]espite a record upfront this winter, our upsell rate fell short in June and July," and, "after growing steadily for a decade, *our upsells have now slowed for 2 years in a row*." Further, despite the previous assurances of "overblown" effects of "macro headwinds" on the pharmaceutical industry, Defendant Tangney stated that "[p]harma's shift to digital has slowed" and Doximity "estimate[s] digital pharma has grown at half the low-teens growth rate that we and eMarketer predicted last year." Defendant Tangney admitted that this was due to "fewer face-to-face meetings with our clients" as Customers failed to schedule in-person meetings with Doximity's sales representatives, a crucial aspect of the Company's upsell model. There were also different methods of advertising that received the "incremental spend" from pharmaceutical advertisers as opposed to the Company's products. As a result of all of this, the Company felt the need to reduce its financial guidance.

140.   Defendant Bryson further explained that "*our major upsells have materially underperformed*, and we expect this to continue in the near term." Moreover, despite having already seen upsell rates at half of Doximity's historical rates in the current fiscal year, the rates continued to decline, which caused "a sizable impact starting in Q2." These declining upsell rates have harmed the outlook for the remainder of the 2024 Fiscal Year, with Defendant Bryson admitting that "we continue to have strong visibility into the roughly 65% of revenue booked to start the year, but the remaining 35% has become increasingly difficult to predict." In response to an analyst's question about weakness across the Company's product areas, Defendant Bryson stated that "*the weakness really is in our mid-tier upsells*." Responding to another question, Defendant Bryson further stated that the weakness in upsells was not merely reduced growth, but "as our upsells are concerned . . . *they declined on an absolute dollar basis*."

141.   Due to the difference between Doximity's client needs and sales approach, Defendant Tangney announced to investors that Doximity "made the difficult decision to

let 10% or roughly 100 of our talented employees go," with the "heaviest [cuts] in our operations and client service teams where live client visits, printing and manual HML edits are just less needed than in the past." Per Defendant Tangney, these cuts would cost the Company "approximately $8 million to $10 million."

142.   On this news, the price of Doximity's common stock fell $7.49 per share, or nearly 23%, from a close of $32.79 per share on August 8, 2023, to close at $25.30 per share on August 9, 2023.

### April 1, 2024 Jehoshaphat Research Report

143.   The truth fully emerged on April 1, 2024, with the publishing of the Jehoshaphat Report. The Jehoshaphat Report alleged that, among other things, "Doximity's underlying sales . . . are *declining* at a negative -3-6% rate, but that this decline has been masked through accelerated revenue recognition." (Emphasis in original). The Jehoshaphat Report further revealed that the Company's revenue growth "has been primarily driven by pulling forward revenues from the future, rather than by [sustainable,] underlying business growth," and that "Doximity has been recognizing previously-deferred revenues earlier and earlier within any given period" as a way of driving reported revenue growth. By analyzing the Company's "underlying" revenues, the Jehoshaphat Report concluded that the Company stopped consistently increasing "true" revenues in the calendar year 2022 and instead has since been experiencing "year-on-year declines in revenue in the last two consecutive quarters," creating obstacles to the Company's ability to generate sustainable revenue growth.

144.   On this news, the price of Doximity's stock fell $1.11 per share, more than 4% over two trading-days, from a close of $26.91 per share on March 28, 202 to close at $25.80 per share on April 2, 2024.

### **REPURCHASES DURING THE RELEVANT PERIOD**

145.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In

total, the Company spent an aggregate amount of **over $109.1 million** to repurchase approximately 3,398,998 shares of its own common stock at artificially inflated prices from June 2022 through July 2023.

146.   According to the Form 10-Q filed with the SEC on August 5, 2022 for the quarterly period ended June 30, 2022 (the "1Q 2023 10-Q"), between June 1, 2022 and June 30, 2022, the Company purchased 273,746 shares of its common stock for approximately $8,869,370 at an average price of $32.40 per share.

147.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $1,806,723 for repurchases of its own stock between June 1, 2022 and June 30, 2022.

148.   According to the 2Q 2023 Form 10-Q, between August 1, 2022 and August 31, 2022, the Company purchased 1,160,157 shares of its common stock for approximately $37,971,938 at an average price of $32.73 per share.

149.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $8,039,888 for repurchases of its own stock between August 1, 2022 and August 31, 2022.

150.   According to the 2Q 2023 Form 10-Q, between September 1, 2022 and September 30, 2022, the Company purchased 717,079 shares of its common stock for approximately $ 23,161,651 at an average price of $32.30 per share.

151.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $4,661,013 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

152.   According to the Form 10-K the Company filed with the SEC on May 26, 2023 for the 2023 Fiscal Year, (the "2023 10-K"), between March 1, 2023 and March 31, 2023, the Company purchased 523,647 shares of its common stock for approximately $16,018,361 at an average price of $30.59 per share.

153.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $2,508,269 for repurchases of its own stock between March 1, 2023 and March 31, 2023.

154.   According to the Form 10-Q filed with the SEC on August 8, 2023 for the quarterly period ended June 30, 2023 (the "1Q 2024 10-Q"), between April 1, 2023 and April 30, 2023, the Company purchased 123,086 shares of its common stock for approximately $ 3,925,212 at an average price of $31.89 per share.

155.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $749,593 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

156.   According to the 1Q 2024 10-Q, between May 1, 2023 and May 31, 2023, the Company purchased 259,373 shares of its common stock for approximately $8,201,374 at an average price of $31.62 per share.

157.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $1,509,550 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

158.   According to the 1Q 2024 10-Q, between June 1, 2023 and June 30, 2023, the Company purchased 281,115 shares of its common stock for approximately $8,967,568 at an average price of $31.90 per share.

159.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $1,714,801 for repurchases of its own stock between June 1, 2023 and June 30, 2023.

160.   According to the Form 10-Q filed with the SEC on November 9, 2023 for the quarterly period ended September 30, 2023 (the "2Q 2024 10-Q"), between July 1, 2023 and July 31, 2023, the Company purchased 60,795 shares of its common stock for approximately $1,985,564 at an average price of $32.66 per share.

161.   As the Company's stock was actually worth only $25.80 per share, the price at closing on April 2, 2024, the Company overpaid by approximately $417,053 for repurchases of its own stock between July 1, 2023 and July 31, 2023.

162.   Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by *over $21.4 million*.

## DAMAGES TO DOXIMITY

163.   As a direct and proximate result of the Individual Defendants' conduct, Doximity has lost and will continue to lose and expend many millions of dollars.

164.   Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

165.   Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

166.   Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

167.   Such losses include the Company's overpayment of almost $21.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

168.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

169.   As a direct and proximate result of the Individual Defendants' conduct,

Doximity has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

170.  Plaintiff brings this action derivatively and for the benefit of Doximity to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of Doximity, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Tangney and Bryson.

171.  Doximity is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

172.  Plaintiff is, and has been at all relevant times, a shareholder of Doximity. Plaintiff will adequately and fairly represent the interests of Doximity in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

173.  Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

174.  A pre-suit demand on the Board is futile and, therefore, excused. At the time of the filing of this action, Doximity's Board consists of the following six individuals: Defendants Tangney, Benjamin, Cabral, Spain, Wampler, and Yang (the "Directors"). Plaintiff need only to allege demand futility as to three of the six Directors that are on the Board at the time this action was filed.

175.  Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false

and misleading statements and omissions of material fact, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

176. In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly caused or permitted Doximity to issue materially false and misleading statements. Specifically, the Directors caused Doximity to issue false and misleading statements which were intended to make Doximity appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

177. Demand is further excused as to all of the Directors because each one of them is beholden to and controlled by Defendant Tangney. Defendant Tangney has majority control over the Company by his ownership of both Class A and Class B stock, through which he holds 60.7% of the total voting power of the Company. Accordingly, Defendant Tangney's ability to substantially influence the Board by controlling their continued nomination to the Board and their compensation renders the Directors dependent on, beholden to, and controlled by him and thus make the Directors incapable of independently and disinterestedly investigating any misconduct committed by one another who engaged in and materially benefited from the fraudulent misconduct outlined herein.

178. Moreover, Defendant Tangney, while acting in simultaneous capacities as Doximity's controlling shareholder, Doximity's CEO, and as Doximity's Chairman of the Board, personally made many of the false and misleading statements in the press releases, 10-Qs, and investor conferences alleged herein. Additionally, he personally signed the false and misleading 2Q 2023 Form 10-Q and 3Q 2023 Form 10-Q and solicited the false and misleading 2022 and 2023 Proxy Statements. Further, he facilitated the Individual Defendants' breaches of their fiduciary duties and aided and abetted those breaches of

fiduciary duties.

179.    To date, Defendants Benjamin, Cabral, and Wampler have received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein. As a result of the false and misleading statements, Defendant Benjamin profited by over $586,000 during the Relevant Period, Defendant Cabral profited by over $1.9 million during the Relevant Period, and Defendant Wampler profited by over $737,000 during the Relevant Period.

180.    Additional reasons that demand on Defendant Tangney is futile follow. Defendant Tangney co-founded Doximity in 2010 and is the Company's controlling shareholder with personal control of more than 60 percent of the Company's voting power. Since founding the Company, Defendant Tangney has served as the Company's CEO and Chairman of the Board. As the Company's highest officer and Chairman of the Company, Defendant Tangney bears significant culpability for the issuance of false and misleading statements during the Relevant Period. These include the false and misleading statements in the 2022 and 2023 Proxy Statements, which he solicited, and the 2Q 2023 Form 10-Q and 3Q 2023 Form 10-Q, which he signed. In addition, Defendant Tangney solicited both the 2022 and 2023 Proxy Statements, which led to the reelection of himself and Defendants Wampler, Spain, and Cabral, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Tangney with his principal occupation for which he receives handsome compensation. Thus, he cannot disinterestedly consider a demand to sue the directors that control his continued employment, other members of management with whom he worked or still works, and himself. As a trusted Company director and the Company's highest officer and controlling shareholder, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme described herein, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the

false and misleading statements alleged herein. For these reasons, Defendant Tangney breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.   Additional reasons that demand on Defendant Benjamin is futile follow. Defendant Benjamin has served as a Company director since March 2020. She also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. In addition, Defendant Benjamin solicited both the 2022 and 2023 Proxy Statements, which led to the reelection of Defendants Tangney, Wampler, Spain, and Cabral, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Benjamin with handsome compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Moreover, Defendant Benjamin has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $586,000. For these reasons, Defendant Benjamin breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

182.   Additional reasons that demand on Defendant Cabral is futile follow. Defendant Cabral has served as a Company director since September 2020. He also serves as the chair of the Audit Committee. In addition, Defendant Cabral solicited both the 2022 and 2023 Proxy Statements, which led to the reelection of himself and Defendants

Tangney, Wampler, and Spain, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Cabral with handsome compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Moreover, Defendant Cabral has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein, with personal proceeds exceeding $1.9 million. For these reasons, Defendant Cabral breached his fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.   Additional reasons that demand on Defendant Spain is futile follow. Defendant Spain has served as a Company director since March 2011. He also serves as the chair of the Compensation Committee and as a member of the Audit Committee. In addition, Defendant Spain solicited both the 2022 and 2023 Proxy Statements, which led to the reelection of himself and Defendants Tangney, Wampler, and Cabral, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Spain with handsome compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Spain breached his fiduciary duties to the Company, faces a substantial

likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.   Additional reasons that demand on Defendant Wampler is futile follow. Defendant Wampler has served as a Company director since March 2020. She also serves as the chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. In addition, Defendant Wampler solicited both the 2022 and 2023 Proxy Statements, which led to the reelection of herself and Defendants Tangney, Spain, and Cabral, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Wampler with handsome compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Moreover, Defendant Wampler has materially benefitted from the Individual Defendants' breaches of fiduciary duty alleged herein, having made insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements alleged herein for personal proceeds exceeding $737,000. For these reasons, Defendant Wampler breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

185.   Additional reasons that demand on Defendant Yang is futile follow. Defendant Yang has served as a Company director since August 2022. She also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. In addition, Defendant Yang solicited the 2023 Proxy Statement, which led to the reelection of Defendants Spain and Cabral, allowing them to continue breaching their fiduciary duties to the Company. The Company provides Defendant Yang with handsome

compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Yang breached her fiduciary duties to the Company, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

186.    Additional reasons that demand on the Board is futile follow.

187.    Each of the Directors, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay *by approximately $21.4 million* for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

188.    The Directors have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. For instance, Defendants Tangney and Spain have each served on the Company's Board since 2010 and 2011, respectively. In other words, they have shared the Company's Board room with each other for over thirteen years. Additionally, Defendants Tangney and Spain collectively control over 80% of the Company's voting power, thereby strengthening and solidifying their long-term control of the Board. These conflicts of interest precluded Defendants Tangney and Spain from adequately monitoring the Company's operations and internal

controls and calling into question the Individual Defendants' conduct, including each other's. Thus, demand upon Defendants Tangney and Spain would be futile.

189.   Defendants Cabral, Benjamin, and Spain (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

190.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

191.   Doximity has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits

against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Doximity any part of the damages Doximity suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

192.    The acts complained of herein constitute violations of fiduciary duties owed by Doximity's officers and directors, and these acts are incapable of ratification.

193.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Doximity. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Doximity, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

194.    If there is no directors' and officers' liability insurance, then the Directors will not cause Doximity to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

195.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

196.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

198.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

199.   Under the direction and watch of the Individual Defendants, both the 2022 and 2023 Proxy Statements failed to disclose, *inter alia*: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 and 2023 Proxy Statements' descriptions of the Board's and its Committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

200.   The 2022 and 2023 Proxy Statements also failed to disclose, *inter alia*, that: (1) competition and tightening macroeconomic conditions on Doximity had a more substantial impact on the Company's performance than represented; (2) the Company's reliance on upselling products and services to existing Customers was more vital to

Doximity's performance and future growth than was represented; (3) as a result, Doximity's business prospects and the sustainability of revenue growth and profitability were much more fragile than represented; (4) as a further result of the foregoing, the price of Doximity's common stock was artificially inflated; and (5) the Company failed to maintain adequate internal controls.

201.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 and 2023 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 and 2023 Proxy Statements, including but not limited to the election of the Company's directors.

202.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders re-elected Defendants Tangney and Wampler to the Board, allowing them to continue breaching their fiduciary duties to Doximity.

203.    As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders re-elected Defendants Spain and Cabral to the Board, allowing them to continue breaching their fiduciary duties to Doximity.

204.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

205.    Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Doximity. Not only is Doximity now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder,

but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Doximity by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Doximity.

208. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports with the SEC.

209. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Doximity not misleading.

210. The Individual Defendants, as controlling shareholders, top executives, and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as controlling shareholders, directors, and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Doximity.

211. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were

available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

212.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

213.   Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

214.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215.   The Individual Defendants, by virtue of their positions with Doximity and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Doximity and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Doximity to engage in the illegal conduct and practices complained of herein.

216.   Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

217.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

218.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Doximity's business and affairs.

219.   Each of the Individual Defendants violated and breached their fiduciary duties

of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

220.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Doximity.

221.    In breach of their fiduciary duties owed to Doximity, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) competition and tightening macroeconomic conditions on Doximity had a more substantial impact on the Company's performance than represented; (2) the Company's reliance on upselling products and services to existing Customers was more vital to Doximity's performance and future growth than was represented; (3) as a result, Doximity's business prospects and the sustainability of revenue growth and profitability were much more fragile than represented; (4) as a further result of the foregoing, the price of Doximity's common stock was artificially inflated; and (5) the Company failed to maintain adequate internal controls. As a result of the foregoing statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all times.

222.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

223.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

224.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was

exposed, while four of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $4.3 million.

225. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Doximity's securities.

226. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Doximity's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

227. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

228. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Doximity has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

229.   Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

230.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

231.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Doximity.

232.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Doximity that was tied to the performance or artificially inflated valuation of Doximity, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

233.   Plaintiff, as a shareholder and a representative of Doximity, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

234.   Plaintiff, on behalf of Doximity, has no adequate remedy at law.

## SIXTH CLAIM
### Against Individual Defendants for Abuse of Control

235.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

236.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Doximity, for which they are legally responsible.

237.   As a direct and proximate result of the Individual Defendants' abuse of control, Doximity has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

238.   Plaintiff, on behalf of Doximity, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

239.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

240.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Doximity in a manner consistent with the operations of a publicly held corporation.

241.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Doximity has sustained and will continue to sustain significant damages.

242.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

243.   Plaintiff, on behalf of Doximity, has no adequate remedy at law.

**EIGHTH CLAIM**
**Against Individual Defendants for Waste of Corporate Assets**

244.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

246.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused

Doximity to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future Customers who no longer trust the Company and its products.

247.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

248.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

249.    Plaintiff, on behalf of Doximity, has no adequate remedy at law.

**NINTH CLAIM**

**Against Defendants Tangney and Bryson for Contribution Under Section 10(b) and 21D of the Exchange Act**

250.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

251.    Doximity and Defendants Tangney and Bryson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Tangney and Bryson's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

252.    Defendants Tangney and Bryson, because of their positions of control and authority as controlling shareholder, officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

253.    Accordingly, Defendants Tangney and Bryson are liable under 15 U.S.C.

§ 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

254. As such, Doximity is entitled to receive all appropriate contribution or indemnification from Defendants Tangney and Bryson.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Doximity, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Doximity;

(c)   Determining and awarding to Doximity the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Doximity and the Individual Defendants to take all necessary actions to reform and improve Doximity's corporate governance and internal procedures to comply with applicable laws and to protect Doximity and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Doximity to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Doximity restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 9, 2024                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Robert C. Moest*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# **VERIFICATION**

I, Dalton Douglas, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th day of May, 2024.

DocuSigned by:

*Dalton Douglas*

5F38DB23C855482

Dalton Douglas